AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>ANDREY PEROV<br><br>*Defendant(s)* | )<br>)<br>) Case No. 24-mj-6121-PAB<br>)<br>)<br>) |

FILED BY ____SM____ D.C.

Mar 19, 2024

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FTL

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __2017 through the present__ in the county of __Broward__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Sections 1956(h) | Conspiracy to Launder Monetary Instruments and Conspiracy to Engage in Monetary Transactions in Property Derived from a Specified Unlawful Activity |
| Title 18, United States Code, Sections 1960 | Operating a Money Transmitting Business Without a License |

This criminal complaint is based on these facts:
See attached affidavit

☑ Continued on the attached sheet.

*Complainant's signature*

FBI Special Agent Bert Ferguson
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. 4.1 by telephone or FaceTime

Date: 3-19-2024

City and state: Fort Lauderdale, Florida

*Judge's signature*

PANAYOTTA AUGUSTIN-BIRCH, US Magistrate
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Bert Ferguson, be dually sworn, depose and state as follows:

1. I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been so employed since February 2018. I am currently assigned to the Transnational Organized Crime Section. As a Special Agent with the FBI, my duties and responsibilities include investigations and assisting with the prosecutions of individuals involved in complex criminal activity regarding a wide range of federal criminal violations. I am empowered by law to conduct investigations and make arrests for offenses enumerated in Title 18 and Title 21 of United States Code, among other violations.

2. The statements contained in this affidavit are based on my own personal knowledge, as well as other information provided to me by other law enforcement officers and employees of the FBI. I have not included in this affidavit each fact and circumstance known to me, but only the facts and circumstances that are sufficient to establish probable cause in the support of a criminal complaint.

### Violations of Law

3. This affidavit is written in support of a criminal complaint charging **ANDREY PEROV** (hereinafter referred to as "**PEROV**") with Conspiracy to Launder Monetary Instruments, in violation of Title 18 U.S.C. § 1956(h); Conspiracy to Engage in Monetary Transactions in Property Derived from a Specified Unlawful Activity, in violation of Title 18 U.S.C. § 1956(h); and Operating a Money Transmitting Business Without a License, in violation of Title 18 U.S.C. § 1960.

## Background

4. From in or about May 2016 through the present, **PEROV** owned Bee Pawn, LLC, a pawn shop in Miami, Florida. From in or about 2020 through the present, **PEROV** owned Hard Rock Giffies, a pawn shop in Hollywood, Florida.

### A. Applicable Federal Laws

5. Businesses that engage in redeeming money orders and other similar instruments, such as gift cards, for cash, are money transmitting businesses as defined in 18 U.S.C. § 5330(d)(1) and are required to register such businesses with the Secretary of the Treasury within 180 days from the date the business is established.

6. The defendant has never obtained a license to operate a money transmitting business from the Secretary of the Treasury.

### B. Applicable Florida Laws

7. Under the laws of the state of Florida a person may not engage in a money services business unless the person is licensed or exempted from obtaining a license. Section 560.125(1) Florida Statute.

8. A "money services business" is defined as any person located in or doing business in this state, from this state, or into this state from locations outside this state or country who acts as a payment instrument seller, foreign currency exchanger, check casher, or money transmitter. Section 560.103 (23) Florida Statute.

9. A person who operates a money service business in the state of Florida without a license and the violation involves currency, monetary value, payment instruments, or virtual currency totaling or exceeding $100,000 in any 12-month period, commits a first-degree felony. Section 560.125(5)(c) Florida Statutes.

10. The defendant has never obtained a license to operate a money service business in the state of Florida.

## Probable Cause

### Confidential Human Source 1 (herein "CHS1") and a Co-Conspirator Launder Funds

11  On or about August 7, 2019, a Confidential Human Source 1 (hereinafter referred to as "CHS1") pled guilty in the Broward County Circuit Court to charges related to trafficking of narcotics. CHS1 is cooperating with the United States government during the time period prior to the sentencing, in anticipation of a reduced sentence. As of the date of the filing of this Complaint, CHS1 has not been sentenced.

12. In or about August 2019, Special Agents of the FBI and DEA debriefed CHS1 in the presence of his/her counsel regarding the facts underlining his/her arrest. Following the initial debriefing, CHS1 agreed to continue his/her cooperation with law enforcement. CHS1 told law enforcement that beginning in or about November 2015, a co-conspirator (hereinafter "Co-Conspirator 1") of **PEROV**, had, in the past, laundered drug proceeds for CHS1 by accepting drug proceeds in the form of US currency and writing a check to CHS1 from Co-Conspirator 1's business making it appear that CHS1 had performed services for Co-Conspirator 1's business.

### Laundering of Funds for CHS1 Through PEROV and PEROV's Assistant

13. Pursuit to investigative strategy, CHS1 contacted Co-Conspirator 1 and advised Co-Conspirator 1 that CHS1 had $110,000 remaining money from narcotics proceeds. CHS1 advised Co-Conspirator 1 that CHS1 had been arrested and pled guilty to distribution of controlled substances. CHS1 advised Co-Conspirator 1 that CHS1 was facing a potential three-year sentence of incarceration and wanted to buy business assets and provide CHS1's wife with money while CHS1 was incarcerated.

14. Co-Conspirator 1 did not want to launder the funds, but offered to introduce CHS1 to someone who could, **PEROV**.

15. Co-Conspirator 1 informed CHS1 that **PEROV** had a business that bought "gift cards" for cash in Florida. Co-Conspirator 1 stated that **PEROV** always needed cash on hand in order to purchase the "gift cards."

16. On or about January 27, 2021, CHS1 consensually recorded an in-person conversation with **PEROV**. **PEROV** stated that he owned several pawn shops in South Florida and could always use U.S. currency to purchase "gift cards." CHS1 told **PEROV** about his (CHS1's) concerns about the source of his money. CHS1 stated to **PEROV** that, "I don't want it to come back and haunt me. This is dirty money. You know, this is drug money that I did..., a while back." CHS1 further advised **PEROV**, "Selling pills and stuff like that." **PEROV** asked, Selling what?" CHS1 responded, "Huh? Selling pills." **PEROV** answered, "Pills? Okay. No, I don't judge." **PEROV** agreed to receive $11,000 in cash proceeds from CHS1 and to launder the drug proceeds through **PEROV**'s pawn shops. **PEROV** agreed to electronically wire the proceeds to a bank account maintained by CHS1, which bank account, pursuant to investigative strategy, was, in fact, a covert bank account maintained by law enforcement.

17. The funds wired to CHS1 in exchange for the drug proceeds were electronically wired in the names of various companies, owned, controlled, and established by **PEROV**, but were in the names of his co-conspirators.

18. **PEROV** instructed CHS1 to deal with **PEROV**'s assistant for the laundering of proceeds in the future. CHS1 met with and recorded conversations with **PEROV**'s assistant regarding the laundering of the narcotics proceeds.

19. In one of the initial meetings between CHS1 and **PEROV**'s assistant, CHS1 stated that, "Andrey (**PEROV**) knows that this is like, you know...drug money." **PEROV**'s assistant responded, "I know, I know."

20. From in or about February 18, 2021, through in or about June 3, 2021, CHS1 provided cash proceeds to **PEROV**'s assistant on three occasions to be laundered through the pawn shops. CHS1 provided a total of $99,000 of cash proceeds to **PEROV**'s assistant. CHS1 advised **PEROV**'s assistant that the cash had been generated from the illegal distribution of narcotics. After receipt of the cash, **PEROV**'s assistant and co-conspirators electronically transferred funds from several of **PEROV**'s bank accounts that were in the names of co-conspirators to a covert bank account maintained by the United States government.

### Laundering of Funds for CHS2 Through PEROV and his Co-conspirators

21. Pursuant to investigative strategy, CHS1 informed **PEROV**'s assistant that CHS1 had an associate (hereinafter "CHS2") who dealt with "gift cards." **PEROV**'s assistant agreed to meet CHS2 on July 22, 2021.

22. In order to facilitate the investigation, arrangements were made with an interstate commercial gift card supplier to purchase gift cards to be used in the investigation. These "gift cards" were to be provided to **PEROV**'s assistant by CHS2 and were represented either to have been stolen or fraudulently acquired. The FBI obtained $540,000 worth of gift cards to be used in the investigation.

23. On or about December 17, 2021, CHS2, a Russian speaker, met with **PEROV**'s assistant and provided **PEROV**'s assistant $40,000 of gift cards. CHS2 consensually recorded the conversation with **PEROV**'s assistant. CHS2 and **PEROV**'s assistant agreed that the gift cards

would be provided to **PEROV** and **PEROV**'s assistant for a price that was less than the face amount. On several occasions CHS2 advised that the gift cards had been fraudulently obtained.

24. From in or about December 17, 2021, through in or about November 22, 2022, CHS2 provided approximately $540,000 worth of gift cards to **PEROV**'s assistant and CHS2 received $460,000 in return.

### The Unlicensed Money Transmitting Business

25. In or about September 2023, law enforcement approached a co-conspirator (hereinafter referred to as "the Co-Conspirator"). Law enforcement requested his/her cooperation and he/she agreed to cooperate with law enforcement. The Co-Conspirator was debriefed concerning **PEROV** and the operation of the pawn shops and the gift card business. During the debrief, the Co-Conspirator explained that **PEROV** utilized pawn shops to accept stolen and fraudulent gift cards and money orders. The Co-Conspirator further explained that **PEROV**'s business transmitted cash proceeds to individuals involved in criminal activities.

26. According to Co-Conspirator 2, **PEROV** mentioned on more than one occasion that the pawn shops needed to have a money transmitting license to conduct the business of redeeming the gift cards and money orders.[1] However, **PEROV** never obtained either a Federal or State money remitting license.

27. The Co-Conspirator stated to law enforcement that he/she estimated that approximately 70% of all gift cards and 100% of all money orders that were sold to **PEROV's** stores were fraudulent. With respect to the money orders that were redeemed by **PEROV**'s pawn shops, the

---

[1] Knowledge of the requirement that a business must obtain a money transmitting license is not an element of the offense of illegally operating a money transmitting business. See 18 U.S.C. Section 1960(b)(1)(A) and (B). The statute specifically states the such business "is operated without an appropriate money transmitting license...whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable." See 18 U.S.C. Section 1960(b)(1)(A)

Co-Conspirator advised that all the money orders that were coming into **PEROV**'s stores were fraudulent. The Co-Conspirator explained that there was no legitimate reason why someone would want to sell a money order to the store since money orders could already be used to pay bills, rent, etc. They were as liquid as cash.

28. The Co-Conspirator advised that **PEROV**'s businesses accepted gift cards and money orders from persons who were suspicious. The Co-Conspirator explained that he/she believed that most of the gift cards/money orders being sold to **PEROV**'s stores were the result of criminal activity, because of how the business operated. The Co-Conspirator explained that generally no photo identification was taken from certain individuals who were selling large quantities of gift cards/money orders to the store. The Co-Conspirator recalled that sometimes when photo identifications were requested, the male customers provided a female's photo identification card.

29. The Co-Conspirator advised law enforcement that **PEROV** kept an online ledger of all the gift card and money order transactions. The Co-Conspirator explained that the online ledger included client photo identification cards, gift card numbers, money order numbers, denied card numbers (cards denied due to fraud by a corporation), client phone numbers, addresses for clients, amounts of gift cards and money orders sold by each client, order forms of gift cards and money orders sold to other clients, bank information for wires sent to clients, social media profile information, and all cash transaction data for the pawn shops.

30. On or about February 9, 2024, law enforcement obtained a court-authorized search warrant to search the online ledger. The search warrant revealed that from 2017 through the date of the search, **PEROV**'s pawn shops collectively redeemed for cash approximately $53,000,000 of money orders and gift cards. The gift cards were from VISA, American Express, Marshall's, Target, Walmart and other companies who do business in interstate commerce. Of those cards

that **PEROV**'s pawn shops processed, approximately $2,000,000 of the gift cards were denied, meaning that they were blocked due to fraud or theft. The search also revealed that some of the top customers were listed by what were apparently false names to hide their true identity. The names listed on the online ledger included Tom Hanks, Michael Jackson, and Fats Fatz. Many of the profiles in the system did not have an identification card to correlate with a person's profile. Of the approximately $53,000,000 in gift cards and money orders redeemed, one individual redeemed over $700,000 in gift cards, two individuals redeemed over $600,000 in gift cards, and another individual redeemed over $400,000 in gift cards. Twelve other persons redeemed more than $100,000, but less than $400,000 in gift cards.

## Conclusion

31.     Based upon the forgoing I submit that there is probable cause to believe that from in or about November 17, 2015, through in or about December 12, 2022, **ANDREY PEROV** engaged in a Conspiracy to Launder Monetary Instruments, in violation of Title 18 U.S.C. § 1956(h); a Conspiracy to Engage in Monetary Transactions in Property Derived from a Specified Unlawful Activity, in violation of Title 18 U.S.C. § 1956(h); and Operated a Money Transmitting Business Without a License, in violation of Title 18 U.S.C. § 1960.

. FURTHER YOUR AFFIANT SAYETH NAUGHT.

Special Agent Bert Ferguson
Federal Bureau of Investigation

Attested to by the applicant in accordance with
the requirements of Fed. R. Crim. 4.1 by telephone/FaceTime
this **19th** day of March 2024.

HON. PANAYOTTA AUGUSTIN-BIRCH
UNITED STATES MAGISTRATE JUDGE

8